UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
JOSE J. SHOMO,                                  :
                                                :
                      Plaintiff,   :   **OPINION AND ORDER**
                                                :   **GRANTING DEFENDANTS'**
      -against-                        :   **MOTION FOR SUMMARY**
                                                :   **JUDGMENT**
DR. JOY MYERS, DR. SHAHIS NAWAZ,                :
and DR. RAMEEH SEEGOBIN, each in their          :
individual and official capacities,             :   03 Civ. 10213 (AKH)
                                                :
                      Defendants.  :
---------------------------------------------------------------x

ALVIN K. HELLERSTEIN, U.S.D.J.:

      Plaintiff pro se Jose J. Shomo, an inmate in the custody of the Department of Correctional Services of the State of New York, brought this suit pursuant to 42 U.S.C. § 1983, seeking compensatory damages for alleged violations of his First, Fourth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution by thirteen named defendants and 5 unnamed defendants. Defendants moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and on April 1, 2005, I dismissed Plaintiff's lawsuit with limited leave to replead against the above-captioned doctors. See Shomo v. City of New York, No. 03 Civ. 10213, 2005 U.S. Dist. LEXIS 5488 (S.D.N.Y. 2005). Plaintiff filed an amended complaint on April 30, 2005, and following discovery, Defendants moved for summary judgment. For the reasons stated below, Defendants' motion is granted.

## Background

### I.     Plaintiff's Amended Complaint

      Plaintiff bases his repleaded claims on alleged deliberate indifference to his serious medical needs relating to his upper body paralysis and nervous system afflictions.

1

Plaintiff states that he suffers from pain and paralysis in his arms, making it difficult or impossible to perform activities of daily living (ADLs) such as eating, dressing, grooming, toileting, or bathing, and alleges that Defendants knowingly and deliberately ignored his condition by refusing to provide treatment or transfer him to an appropriate medical facility. Plaintiff alleges that he was improperly housed with the general population of inmates during his confinement in various detention facilities, when he should have been admitted to infirmary care because of his medical condition.  As a result of these deprivations and improper treatment, Plaintiff contends that he was forced to pay other inmates for assistance with his ADLs and that he experienced muscle spasms, migraine headaches, severe back and neck pain, and emotional trauma.

## II.     Defendants' Affirmative Defenses

In their motion to dismiss pursuant to Rule 12(b)(6), Defendants argued that Plaintiff's lawsuit was barred by the statute of limitations applicable to Section 1983 claims.  I agreed and held that all of the specific allegations in Plaintiff's complaint occurred outside of the statute of limitations period.  See generally id.  Because Plaintiff alleged generally that Defendants deprived him of adequate medical care during the statutory period, however, I granted him partial leave to amend his complaint to allege specific acts causing injuries committed by or at the instruction of Drs. Myers, Nawaz, and Seegobin occurring after September 26, 2000.  I held that if Plaintiff were able to show that Defendants' deliberate indifference to his serious medical needs continued past that date, his claims would not be time-barred.  See id. (holding that doctrine of continuing violation applies to deliberate medical indifference claims).

In their motion for summary judgment pursuant to Rule 56(c), Defendants renew

their argument that Plaintiff's claims are barred by the statute of limitations and assert that they are entitled to qualified immunity as state officers. Addressing the merits of Plaintiff's suit, Defendants argue that no issue of material fact is in dispute with respect to Plaintiff's medical condition or Defendants' state of mind, such that Defendants are entitled to judgment as a matter of law. I rule on each of these arguments below.

## Discussion

### I.  Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex v. Catrett, 477 U.S. 317, 322 (1986). The moving party must demonstrate the absence of any material factual issue genuinely in dispute, and the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The non-moving party may not rely, however, "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1987).

Rule 56 of the Federal Rules of Civil Procedure requires the Court, on Defendants' motion, to engage in a two-step inquiry: First, I must determine whether Defendants have properly supported their motion for summary judgment, as the burden of production lies with the moving party. See Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001) ("[T]he the burden of the nonmovant to respond arises only if the motion is properly 'supported'—and therefore summary judgment only is 'appropriate' when the moving party has met its burden of production."). Second, if Defendants have properly supported their motion, I must determine whether Plaintiff's response, "by affidavits or as otherwise provided [in Rule

56], sets forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## II.  Statute of Limitations

For reasons set forth at length in Shomo v. City of New York, supra, I held that in order to come within the statute of limitations, Plaintiff must allege specific acts causing injuries committed by or at the instruction of Defendants occurring after September 26, 2000. See 2005 U.S. Dist. LEXIS 5488 at *10–19, 32–36.  His amended pleading satisfies that requirement, but more than pleading is required to oppose a motion for summary judgment.  See Fed. R. Civ. P. 56(e) ("an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading").

With respect to Drs. Nawaz and Seegobin, Plaintiff fails to make a showing sufficient to establish that these Defendants committed any acts or furthered a policy of medical indifference within the statutory period.  Plaintiff cites several pages of his compiled medical record as evidence of Dr. Seegobin's involvement and indifference, but these pages are dated before September 26, 2000.  See Smith Decl., Ex. D at 32, 101.  Medical records show that Dr. Nawaz interacted with Plaintiff after the statutory date, but do not suggest indifference on Dr. Nawaz's part, even when all available inferences are drawn in the light most favorable to Plaintiff.  See e.g., id., Ex. D at 50, 52 (referring Plaintiff to infirmary for assistance with ADLs on January 3, 2001).  At his deposition, Plaintiff could not recall any specific encounter with Dr. Nawaz or Dr. Seegobin, or describe any aspect of their appearance, and conceded that he based his allegations against them on notations found in his medical records.  See id., Ex. B at 45–46.  As those medical records contain no evidence upon which a reasonable jury could determine that Drs. Nawaz and Seegobin had substantial interaction with Plaintiff within the relevant statutory limits, summary judgment is appropriate.  See Celotex, 477 U.S. at 322.  Plaintiff's claims

against Drs. Nawaz and Seegobin are barred by the applicable statute of limitations, and the complaint against them is dismissed with prejudice.

Plaintiff has demonstrated, however, that his involvement with Dr. Myers continued past September 26, 2000, see Smith Decl., Ex. D at 35–36, and I turn to the specific facts of Plaintiff's claim against her.

### III.   Deliberate Indifference to Serious Medical Needs

The government has an obligation "to provide medical care for those whom it is punishing by incarceration." Estelle v. Gamble, 429 U.S. 97, 103 (1976).  In order to establish a claim under 42 U.S.C. § 1983 for failure to provide medical care, the plaintiff must allege not only that he suffered from a serious injury, but also that the injury sustained was caused by "deliberate indifference" on the part of the defendants. Farmer v. Brennan, 511 U.S. 825, 832 (1994).  Analytically, the deliberate indifference standard has two prongs, one objective and one subjective.  First, the "alleged deprivation must be, in objective terms, 'sufficiently serious.'" See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  Secondly, the plaintiff must demonstrate that the defendant's subjective state of mind was "equivalent to criminal recklessness." Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003); see also Farmer, 511 U.S. at 837 (holding that "the official must both be aware of facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw that inference").

Defendants argue that Plaintiff cannot demonstrate the existence of material facts in genuine dispute in relation to either prong.  They deny that his medical condition was sufficiently serious to warrant the treatment Plaintiff sought, and separately, they argue that Plaintiff makes no showing that Defendants possessed the requisite state of mind to establish a

deliberate indifference claim.

    A.  <u>Sufficiently Serious Injury and Deprivation of Medical Care</u>

According to the medical records supplied by Plaintiff and Defendants, Plaintiff suffered a permanent injury to his arms when he touched an electrical socket on October 24, 1994. <u>See</u> <u>e.g.</u>, Smith Decl., Ex. B at 31–32; Ex. D at 263. The electrocution apparently caused damage to his arms, diagnosed as left brachial plexopathy[1] and reflex sympathetic dystrophy.[2] <u>See</u> <u>id.</u>, Ex. D at 92. Plaintiff's electrocution injury occurred about five years before he was placed in the custody of the Department of Correctional Services, and Plaintiff does not claim that Defendants caused or worsened his original injury. Rather, he claims that Defendants were deliberately indifferent to his condition insofar as they left him within the general prison population, as opposed to a medical facility, where he suffered undue pain and humiliation for lack of assistance with his ADLs.

The parties dispute the extent to which Plaintiff's medical condition inhibited his ability to perform various life activities. On one hand, Plaintiff asserts that his arms were essentially paralyzed, leaving him unable to eat, dress, groom, toilet, or bath without assistance, and on the other, Defendants assert that Plaintiff exaggerated the extent of his injuries, and was capable of performing most ADLs. The record reflects that the doctors who treated Shomo during his period of confinement rendered varying opinions as to whether he was capable of performing ADLs. <u>Compare</u> <u>id.</u>, Ex. D at 300 (doctor's note dated October 13, 1999 stating "Pt

---

[1] Brachial plexopathy is a nervous system disorder characterized by symptoms such as decreased movement or sensation in the arm, numbness, pain, and muscle weakness. <u>See</u> PDR MEDICAL DICTIONARY 1400–01 (2d ed. 2000); AMERICAN MEDICAL ASSOCIATION ENCYCLOPEDIA OF MEDICINE 723–24 (1989).

[2] Reflex sympathetic dystrophy is a chronic neurological syndrome characterized by severe burning pain, changes in bone and skin, tissue swelling, and extreme sensitivity to touch. <u>See</u> Reflex Sympathetic Dystrophy Association, http://www.rsds.org.

6

may do ADLs") with id., Ex. D at 308 (different doctor's note dated October 12, 1999 stating "please assist Pt c ADLs including eating x 48").

Plaintiff's allegation that he was unable to perform ADLs such as eating, dressing, grooming, toileting, or bathing, and that Defendants, with knowledge of Plaintiff's condition, refused to order assistance with those activities, states a claim of deliberate medical indifference under the Eighth Amendment.  See Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003) (district court should consider "whether [plaintiff's] medical condition significantly affects [his] daily activities"); Shomo, 2005 U.S. Dist. LEXIS 5488 at *32.  Therefore, whether Plaintiff was able to perform ADLs is a question of material fact, and I find that there is a basis for genuine dispute as to that fact in the record.  As a result, Dr. Myers is not entitled to summary judgment on the ground that Plaintiff's injury and subsequent deprivation of care was not sufficiently serious.

B.  Defendants' State of Mind

To establish deliberate indifference to his serious medical needs, a plaintiff must demonstrate, in addition, that the defendant's subjective state of mind was "equivalent to criminal recklessness." Hernandez, 341 F.3d at 144.  In this, Plaintiff fails.  The record shows that Dr. Myers declined to transfer Plaintiff to a medical facility.  The record also makes clear that Dr. Myers either knew, or was chargeable with knowledge, of Plaintiff's complaints.  The issue of concern is whether she deliberately disregarded such knowledge.

Dr. Myers has supported her motion by citation to reports and notations stating that Plaintiff did not require assistance with ADLs.  See e.g., id., Ex. D at 213, 289, 293, 300. Plaintiff must make a showing, therefore, sufficient to establish the existence of Dr. Myers' criminally reckless mental state—that is, sufficient to allow the finder of fact to draw the

7

inference that Dr. Myers had a criminally reckless state of mind.

The parties' submissions reflect that Dr. Myers consulted with various doctors with regard to Plaintiff's treatment and reviewed his medical records from September, 1999 to December, 2000.  See Smith Decl., Ex. C at ¶¶ 5–6; Ex. D at 8, 35, 36, 210.  I assume, therefore, that she was aware of the existence of medical reports and notations recommending that Plaintiff receive assistance with his ADLs, as well as conflicting reports indicating that Plaintiff did not need such assistance.  Faced with a body of conflicting professional judgments, Dr. Myers, in her capacity as Chief Physician, was compelled to make a professional judgment of her own.  She determined that Plaintiff was sufficiently capable of performing activities of daily living, and that transfer to a hospital facility was unnecessary.  See id., Ex. C at ¶ 48.  Her judgment was rationally based, and there are no facts in the record from which to infer a criminally reckless state of mind.

Plaintiff met with many doctors, resulting in varying diagnoses and recommendations.  On September 25, 1999, Dr. Harjinder Bhatti opined that Plaintiff "[w]ould need infirmary care for assistance with feeding and activities for daily living.  Transfer to NIC – accepted by Dr. [illegible]."  See id., Ex. D at 198.  Physician's Assistant Doni Pitchford concurred, noting that Plaintiff was "unable to do ADLs" on October 9, 1999.  See id., Ex. D at 254.  Four days later, she reiterated her finding and recommendation for evaluation at Bellevue Hospital.  See id., Ex. D at 252.

But the experts thought differently.  On October 13, 1999, a neurologist examined Plaintiff at Bellevue Hospital and determined that he was able to perform ADLs on his own.  See

8

id., Ex. D at 213, 300 ("Pt may do ADLs").[3]  The neurologist did not indicate "treatment of any kind."  Id.  Plaintiff demonstrated that he was able to eat with a splint.  See id.  Around the same time, prison medical staff noted that Plaintiff, in fact, had been able to eat and toilet without assistance.  See id., Ex. D at 209–13.  Accordingly, on October 16, 1999, Plaintiff was transferred from the infirmary to the general population of inmates.  See id., Ex. D at 7.[4]  Indeed, as Plaintiff's treating physicians noted, Plaintiff had requested the transfer and refused further assistance, even to sign paperwork reflecting that he refused further assistance.  See id., Ex. D at 213.  Defendant Dr. Nawaz noted that Plaintiff would not allow him to make copies of his medical documentation, and that Plaintiff was "very uncooperative at this time."  See id., Ex. D at 7.  Dr. Adiatu concluded that Plaintiff sought to develop litigation opportunities in connection with his medical treatment.  See id., Ex. D at 28.[5]

---

[3] Smith Decl., Ex D. at 213, a note signed by Dr. Nawaz and Physician's Assistant Pitchford, reads:  "39 yo. b. [male] c c/o upper extremity paralysis and lt sided [illegible] obstruction, LT U.E. carpel tunnel syndrome and brachial plexus injury.  Previously able to function s complaints until 10/8/99 Pt c c/o of loss of LT U.E. function [secondary] to pain and weakness that developed p being cuffed by DOC.  C-spine and LT shoulder and elbow [illegible] fractures or dislocations.  Pt. sent to Bellevue [tertiary or third] run for neurology evaluation.  As per P/C statement, Pt c nonfocal neurologic/physical exam.  No indication for treatment of any kind.  Pt. may do ADLs.  Pt. upset and requesting to be transferred to G.P.  Explained to Pt. that option of NIC stay is OPEN to him and that the staff could assist him [illegible].  Despite Pt. refuses NIC STAY.  Note:  Approached Pt. c refusal of NIC stay but refused to sign refusal.  Case re-discussed with Dr. Nawaz.  Secondary to Neurology Eval. and Pt. in no need of ADL assistant there is no requirement for NIC STAY.  Pt. may keep splint to help c eating which he demonstrated in front of myself that he can eat c splint.  I called Dr. Rogers at Harlem Hospital and Pt. had nursing services.  It [illegible] to help c laundry and cooking etc.  The remainder of the time Pt. functioned on his own.  Pt. has not been diagnosed c thoracic outlet obstruction but presently being [illegible].  Pt. can still f/u c neurology to [illegible]  Called Dr. Rogers in Harlem Hospital (Pt. claims his neurologist name is Dr. Rogers) no neurologist by that name."

[4] Smith Decl., Ex D. at 7, a note signed by Drs. Nawaz and Physician's Assistant Pitchford, reads:  "Pt. c nonfocal neurologic and physical exam.  No indication for treatment of any kind.  Pt. transferred to G.P. 10/16/99 [illegible] O.B.C.C. c C/O Lt. U.E. pain c neurology eval no further [illegible] Discussed situation w/ patient today.  Pt. has some previous documentation that may help me assist c helping him but Pt refused to give them to me to make copies.  Explained to patient he has been evaluated 2 x c specialist c no request of w/y or ADL assistance.  Case will be addressed c Dr. Myers and [illegible]  Pt. very uncooperative at this time."

[5] Smith Decl., Ex. D at 28, a note signed by Dr. Adiatu, reads:  "Patient continues to [illegible] everybody and to demand for medically and non-medically necessary treatment.  He was seen by neurology [illegible].  Patient is clinically alright [sic] to go to the court today with foot support on his [illegible] and to be handcuffed on the right wrist to another inmate.  Patient problems needs to be discussed at highest levels because he is always looking for

In November of 1999, Plaintiff again requested help with his ADLs, but treating physicians, apparently relying upon the neurologist's report of October 13, 1999, decided that no such assistance was necessary. See id., Ex. D at 7–9. Physician's Assistant Pitchford noted that the case was discussed with Dr. Myers, who would review Plaintiff's chart and take appropriate action. See id., Ex. D at 8. On December 20, 1999, Simond Tam, a physician's assistant, recorded that Plaintiff claimed to be unable to perform his ADLs. See id., Ex. D at 12. It appears that Tam discussed his finding with Dr. Myers, who determined that Plaintiff's treatment should continue in accordance with the "current plan." Id. On January 14, 2000, Defendant Dr. Seegobin recorded that he discussed Plaintiff's case with Dr. Myers and that they agreed to transfer him "back to D3, since he was never transferred to D2 for any medical reason." See id., Ex. D at 43.

On January 26, 2000, Plaintiff returned to Bellevue Hospital for an additional examination. Drs. Qu and Shively found that with respect to Plaintiff:

> Electrodiagnostic studies are consistent with the presence of a left brachial plexopathy involving mainly the posterior and medial cord. In light of the patients' continuing symptoms of pain especially on movement of the left upper extremity, it is possible that there is a concurrent reflex sympathetic dystrophy.

Id., Ex. D at 127. However, they did not prescribe any particular mode of care, and Plaintiff was returned to the general population. Plaintiff continued to ask for assistance with his ADLs and for physical therapy.

On November 15, 2000, Dr. Adriana Vives recorded Plaintiff's request for assistance with his ADLs, and that she intended to discuss the case with Dr. Myers. See id., Ex.

---

[illegible] and chance to sue. Always talks about [illegible]."

10

D at 35.  On November 20, 2000, Dr. Vives wrote, "Please transfer above inmate to Dorm setting for medical reason."  See id., Ex. D at 106.  On November 27, 2000, Dr. Vives recorded, "As per Dr. Myers [illegible] can't be transferred back to NIC Annex. P- Still [illegible] can't be transferred to the Dorm [illegible].  See id., Ex. D at 36.  On January 3, 2001, Dr. Nawaz requested that Plaintiff be transferred to the infirmary, see id., Ex. D at 91.  On January 4, 2001, Plaintiff was released from prison.

Plaintiff and Dr. Myers have minimal recollection of one another.  Plaintiff avers that Dr. Myers treated him "twelve or thirteen" times but could not recall the specifics of those encounters.  See id., Ex. B at 44, 71 (Plaintiff's deposition transcript).  Nothing in the record indicates that Dr. Myers ever personally examined Plaintiff, and she cannot recall having done so.  See id., Ex. C at ¶ 3.  There is substantial evidence in the record, however, that Dr. Myers based her decisions on the reports of medical care providers, her review of Plaintiff's records, and discussions with Plaintiff's doctors.  Twice, Dr. Myers did not accept the recommendations of subordinates who sought a higher level of care for Plaintiff: in late 1999, with respect to Physician's Assistants Pitchford and Tam, and again in late 2000, with respect to Dr. Adriana Vives.  Instead, Dr. Myers sided with the view of the Bellevue neurologists.

A reasonable jury could not infer that her reliance upon the Bellevue neurology reports was criminally reckless.  None of the neurology reports indicates paralysis, nor do any recommend that Plaintiff receive assistance with ADLs.  Instead, the report of October 13, 1999 states that there is "no indication for treatment of any kind."  Id., Ex. D at 213.  The report of January 26, 2000 states that Plaintiff suffered from left brachial plexopathy and reflex sympathetic dystrophy, but does not indicate paralysis.  See id., Ex. D at 92.  The reports of March and April 2000 indicate that Dr. Appel prescribed physical therapy and occupational

therapy for Plaintiff. See id., Ex. D at 138, 144.

In other cases in which deliberate indifference to serious medical needs was sufficiently alleged or proven, the wrongful act was apparent. In Martinez v. Mancusi, for example, the defendant prison doctor allegedly discharged a surgery patient in direct contravention of the operating surgeon's instructions, and without bothering to determine what the surgeon's post-operation instructions might have been. See 443 F.2d 921, 924 (2d Cir. 1970) (reversing order granting defendant's motion to dismiss); cf. Hamilton v. Endell, 981 F.2d 1062 (9th Cir. 1992) (holding that prison officials' reliance upon doctor's opinion was unreasonable under the circumstances). The evidence in this case does not suggest a finding that Dr. Myers was criminally reckless. Therefore, I grant Dr. Myers' motion.[6]

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted, and the complaint is dismissed with prejudice. The clerk shall mark this case as closed.

SO ORDERED.

Dated: January 10, 2007
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

---

[6] Defendants also claim qualified immunity. I do not reach this claim, but note that the question of whether Defendants are entitled to qualified immunity turns on the same facts as relate to the merits of Plaintiff's deliberate indifference claim. See Hamilton v. Endell, 981 F.2d 1062, 1066 (9th Cir. 1992) ("A finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who deliberately ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law.").